UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

BENJAMIN KRIEGER,

Plaintiff,

v.

KROENKE SPORTS & ENTERTAINMENT, LLC,

Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff, Benjamin Krieger, by and through his attorneys, HKM Employment Attorneys, LLP, for his Complaint against Kroenke Sports & Entertainment, LLC ("Defendant" or the "Company") states and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an employment discrimination case arising from Defendant's discrimination toward and wrongful termination of Plaintiff because he was a 62-year-old man that suffered from one or more disabilities within the meaning of the Americans with Disabilities Act ("ADA") requiring the reasonable accommodation of leave under the Family & Medical Leave Act. Specifically, on or about October 22, 2018, Plaintiff's supervisor and Defendant's Executive Director of Security, Jeremy Vaux, told Plaintiff that he intended to replace Plaintiff with a less experienced employee under 40 years old because "at your age, your useful purpose will have been exceeded." On or about October 25, 2018, Plaintiff made a protected report of age discrimination

to Defendant's Chief Operating Officer, Matthew Hutchings.  On or about October 29, 2018, Plaintiff made a second written complaint of age discrimination to Mr. Hutchings and human resources regarding Mr. Vaux and requested the reasonable accommodation of leave to undergo medical treatment under the Family & Medical Leave Act ("FMLA").

2.     The very same day, Defendant put Plaintiff on mandatory leave pending its investigation of Plaintiff's protected complaint.  Approximately two weeks later, on or about November 13, 2018, Defendant terminated Plaintiff's employment due to purported misconduct it claimed to have learned during its self-serving investigation of Plaintiff's protected complaint. Defendant terminated Plaintiff based on his age, actual and/or perceived disability, and/or in retaliation for engaging in protected opposition to discrimination and requesting the reasonable accommodation of leave under the FMLA related to an actual and/or perceived disability.

## PARTIES

3.     Plaintiff was and is a resident of Colorado at all times relevant to this Complaint.

4.     Defendant Kroenke Sports & Entertainment, LLC is a Delaware limited liability company with a principal street office located at 1000 Chopper Circle, Denver, Colorado 80204.

## JURISDICTION AND VENUE

5.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

6.     This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

8.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

9.     Plaintiff filed his Charge of Discrimination Numbers 32A-2019-00372 and FE2019838714 with the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD"), respectively, for disability and age discrimination and retaliation on or about February 27, 2019.  Plaintiff was issued a Notice of Right to Sue from the CCRD and has requested same from the EEOC.  As of the date of this filing, Plaintiff is still waiting on receipt of the Notice of Right to Sue from the EEOC, which will very likely be received prior to Defendant's responsive pleading.

10.     Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

11.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

12.     Defendant is a diversified sports and entertainment company that, among other things, owns Colorado-based professional basketball and hockey, lacrosse and soccer franchise and operates the Pepsi Center, an entertainment arena in downtown Denver, Colorado.

13.      Plaintiff began working for Defendant in or around December 2013 in its Security Department.  At the time of Plaintiff's termination, Plaintiff was a Shift Supervisor for Defendant's day shift.

14.     At all times during Plaintiff's employment with Defendant, Plaintiff met or exceeded Defendant's legitimate performance expectations.

15.     For example, Plaintiff never received any discipline, whether formal or informal, during his five years working for the Company, with the exception of his sudden termination on November 13, 2018.

16.     Multiple times during Plaintiff's employment with Defendant, Plaintiff applied for various positions with Defendant for which he was not hired, and that Defendant instead filled with younger employees with less experience.  For example, in or around the end of 2017, Plaintiff applied for a promotion with the Safety Department for which he was not hired.  Defendant instead chose an employee under 40 years old with less experience.  When Plaintiff asked his supervisor, Tim Christianson, about Defendant's decision, Mr. Christianson told Plaintiff, "Sports and entertainment is a young man's game."  Plaintiff also applied for positions in the Production and Engineering departments and was not even given an interview.  Upon information and belief, Defendant hired workers under 40 years old with less experience as compared to Plaintiff.

17.     In the spring of 2018, Defendant hired a new Executive Director of Security, Jeremy Vaux.  After his hire, Mr. Vaux set up one-on-one meetings with Defendant's managers and supervisors.  During Plaintiff's one-on-one meeting with Mr. Vaux, which was the first time Plaintiff met him, Mr. Vaux asked Plaintiff what his goals were with the company.  Plaintiff told him that he would like to go into a management/training position, and he responded, "At your age, do you think that is a realistic goal?"

18.     Mr. Vaux, the self-proclaimed "new Sheriff in town," soon began bragging about how he had gotten rid of decades of experience by terminating the Company's older workers.

19.     For instance, according to Mr. Vaux, by November 2018, he had terminated nearly 60 years of experience during his seven months working for the Company.  Mr. Vaux bragged

about this and added, "And I'm not done yet."

20.    Even toward the beginning of Mr. Vaux's employment with the Company, Mr. Vaux told the Company's supervisors during a managers' meeting that he would be getting rid of 30% to 40% of the people in the room, but that some of the managers would be leaving due to what Mr. Vaux referred to as "natural attrition."  Mr. Vaux then pointed to Plaintiff and explained, "at Ben's age, for example, he'll naturally be exiting the company."

21.    Mr. Vaux's prejudiced views based on age became even more apparent as he subjected Plaintiff to disparate and hostile treatment based on his age.  For instance, Plaintiff was commonly referred to as "the old man" or "the old guy" by Mr. Vaux and other employees of Defendant's.

22.    On October 22, 2018, Mr. Vaux called Plaintiff into his office and asked him, "How long do you intend to be here?"  Plaintiff responded that he planned to continue working at least three to four years.  Mr. Vaux responded, "That's not going to happen.  I'm thinking January." Plaintiff asked, "Why January?"  Mr. Vaux replied, "At your age, your useful purpose will have been exceeded.  So, between now and January, I want you to train Josh [Friednash] and I want him fully trained, and in January I want a 30-day handwritten notice of resignation.  I will not accept a 2-week notice of resignation."

23.    The replacement Mr. Vaux wanted Plaintiff to train to take his position, Mr. Friednash, was, upon information and belief, was under 40 years old and had been working for Defendant for only approximately six weeks.

24.    On or about October 25, 2018, Plaintiff engaged in the protected activity of opposing discrimination when he reported Mr. Vaux's comments targeting his age, and his plan to

terminate Plaintiff based on his age, to Defendant's Chief Operating Officer, Matthew Hutchings.

25.     Plaintiff also told Mr. Hutchings about Mr. Vaux's insistence that he and other managers fill out Daily Activity Reports ("DAR's") every 15 minutes while working.  DAR's were reports that Mr. Vaux requested Plaintiff and others to complete every 15 minutes to describe what had been done in the prior 15 minutes.  Mr. Hutchings asked Plaintiff if he had been able to find time to fill out the DAR's every 15 minutes of each day, and Plaintiff candidly told Mr. Hutchings that he had missed three DAR's that week, totaling three missed DAR's in over six months.  Mr. Hutchings looked surprised and asked, "Is that all?"

26.     During his meeting with Mr. Hutchings, Plaintiff also opposed race discrimination by telling Mr. Hutchings that two African American employees had reported to Plaintiff that a Shift Lead, Monica Petruic, had repeatedly called them her "little monkeys."  Plaintiff also told Mr. Hutchings that he had encouraged the two subordinate employees to go to human resources regarding Ms. Petruic's discriminatory conduct.

27.     Mr. Hutchings then asked Plaintiff, "What would you do if you were me?"  Plaintiff replied that he would ask if the person sitting across from him was credible and launch an investigation into what was being reported.  Mr. Hutchings told Plaintiff that he would begin an investigation and assured Plaintiff that Plaintiff's protected report would stay between the two of them, Defendant's Director of Human Resources, Cheryl Miller, and the Company's Chief Counsel, Stephen Stieneker.

28.     Mr. Hutchings and Plaintiff then walked to the elevator together and Mr. Hutchings told Plaintiff, "Sometimes doing the right thing is the hardest thing to do."  He then asked Plaintiff if he would mind if Mr. Hutchings shared what Plaintiff had reported with the Company's

Assistant General Manager, Chris Joswick. Plaintiff told Mr. Hutchings he did not want Mr. Joswick involved, due to previous instances of retaliatory treatment from Mr. Joswick related to protected conduct.

29.     Plaintiff suffers from a long-standing anxiety-related medical condition exacerbated by extreme stress that causes Plaintiff to experience severe dizzy spells and vertigo, nausea, vomiting and diarrhea. During flare-ups, Plaintiff's medical condition substantially limits Plaintiff's ability to stand, walk, lift, bend, perform manual tasks, and work as compared to the general population.

30.     Defendant further knew about Plaintiff's medical condition during his employment, and at the time of Plaintiff's termination. For example, Plaintiff's former manager, Erica Valdez, had witnessed Plaintiff experience severe symptoms related to his medical condition as Plaintiff's supervisor, before she was transferred to Defendant's human resources department.

31.     The targeted, hostile treatment Plaintiff was being subjected to from Mr. Vaux began drastically exacerbating Plaintiff's symptoms related to his medical condition by the end of October 2018.

32.     On October 29, 2018, Plaintiff engaged in the protected activity of requesting the reasonable accommodation of leave to seek medical treatment associated with his disabling medical condition. That morning, Plaintiff emailed human resources, including Ms. Miller, Keri Wilson (Defendant's Human Resources Manager), and Ms. Valdez, requesting paperwork to file for leave under the FMLA.

33.     Human resources emailed Plaintiff the FMLA paperwork later that day. Plaintiff also met with human resources that afternoon to go over the FMLA paperwork, during which time

Plaintiff reiterated his request and intent to take FMLA leave.

34.     On that same morning of October 29, 2018, Plaintiff also reported via email to Mr. Hutchings and Ms. Miller that he was experiencing discrimination from Mr. Vaux based on his age. *See* October 29, 2018 Protected Report, **Exhibit A**.

35.     Later that evening on October 29, 2018, Plaintiff was driving home from work when he was contacted by Mr. Hutchings.  Despite Plaintiff's request that his protected report remain confidential from Mr. Joswick, Mr. Hutchings told Plaintiff that he was with Mr. Joswick during their call, and that Plaintiff was being placed on "paid mandatory leave" and not to report to work the following day as scheduled.

36.     Defendant also disabled Plaintiff's email access that same night, on October 29, 2018.  In doing so, Defendant interfered with Plaintiff's ability to submit his FMLA paperwork regarding his requested accommodation of his actual and/or perceived disability; given that he could no longer even access the FMLA paperwork that he had received from Defendant's human resources earlier that same day.

37.     Also, before any good faith investigation into Plaintiff's protected report of age discrimination could have conceivably occurred, Defendant decided not to place Mr. Vaux on the mandatory leave to which Plaintiff was subjected.

38.     Approximately one week later, Plaintiff was called by Defendant's human resources and asked to come to the Pepsi Center for a meeting with Ms. Miller and Ms. Wilson on or about November 6, 2018.

39.     At the meeting, Ms. Miller initially told Plaintiff, "We want to keep this meeting to the complaint email only."  Plaintiff was then shown a highlighted hard copy of his email reporting

age discrimination and asked some questions about same.  Plaintiff explained why he believed Mr. Vaux was targeting him based on his age, including his comments about Plaintiff having "exceeded his useful purpose" because of his age.

40.     Then, Ms. Miller said she was "going to shift gears."  Ms. Miller accused Plaintiff of purportedly giving himself "additional curb access," a term Plaintiff had never heard before and did not understand.  Plaintiff asked Ms. Miller what she was asking about and Ms. Miller at first refused to give Plaintiff any details.  Ms. Miller eventually asked Plaintiff about what had happened on June 7, 2018.  Plaintiff told Ms. Miller that he remembered the date, because it was his twin kids' birthday, but that he did not recall anything notable happening at work that day.  Ms. Miller said Plaintiff had purportedly granted himself additional access on his security credential on that day.

41.     Plaintiff was floored and told Ms. Miller that the allegation was untrue and impossible because he did not have access to the system that grants additional security credentials or access.   Plaintiff again asked Ms. Miller to elaborate so that he could clear up an apparent misunderstanding.  She refused.

42.     Given the accusatory and punitive nature of the meeting, Plaintiff asked if he was on a suspension from work.  Ms. Miller responded that he was "on paid leave."  Plaintiff asked why, and Ms. Miller claimed, "Because in your letter you expressed concerns of intimidation and retaliation and we didn't want you around [Mr. Vaux]."  Ms. Miller further confirmed that it was only Plaintiff that had been put on mandatory leave.  Plaintiff asked what would happen next, and Ms. Miller told him they would be in contact.

43.     On November 12, 2018, while still on mandatory leave, Plaintiff received a text

message from Ms. Miller asking that he come to the Pepsi Center the next day.  Plaintiff responded

that he would be there and asked about the nature of the meeting.  Ms. Miller responded, "Follow-

up."

44.     The next day, on November 13, 2018, Plaintiff was surprised when the attendees

present at his "follow-up" meeting included Ms. Wilson, Mr. Hutchings and Mr. Joswick.

45.     Mr. Hutchings told Plaintiff, "We have completed our investigation of your

concerns and we have found there are some inconsistencies in your story.  We believe it is a

personality conflict and that it is in the best interest of all parties to just part ways."

46.     At no time did anyone in the meeting contend that Plaintiff's termination was based

on purported complaints from other employees regarding Plaintiff.

47.     Instead, when Plaintiff asked Mr. Hutchings why he was being terminated, Mr.

Hutchings claimed that it was "not a termination, just a parting of ways."

48.     Plaintiff clarified that it was a termination and asked why the decision was being

made multiple times before Mr. Hutchings finally conceded, "Jeremy [Vaux] is our guy and we

have to stand behind him."

49.     Plaintiff again asked for the exact cause of his termination and Mr. Hutchings

stated, "Well, you missed filling out a DAR three times, so we are calling it insubordination."

50.     Mr. Hutchings also told Plaintiff: "And just so you know, this decision went all the

way up to Stan [Kroenke] and he agrees with it."

51.     At no time did anyone in the meeting contend that Plaintiff's termination was based

on purported misconduct, other than Mr. Hutchings claiming that Plaintiff was insubordinate

because he had missed three DAR's.

52.     Notably, prior to Plaintiff's mandatory leave, Plaintiff had notified Mr. Vaux that he had missed three DAR's due to an especially busy week.  Mr. Vaux responded, "Don't let it happen again."  At no time did Mr. Vaux indicate that missing three DAR's over a six-month period could even potentially warrant Plaintiff's termination, or any other discipline.

53.     Similarly, Plaintiff brought up his three missing DAR's during his October 25, 2018 meeting with Mr. Hutchings.  Mr. Hutchings had responded with surprise and asked, "Is that all?"  Again, at no time did anyone from management indicate to Plaintiff that the three missing DAR's were a serious issue until the Company had to grasp for some purportedly legitimate reason to try to justify its decision to terminate Plaintiff approximately two weeks after reporting discrimination and requesting the reasonable accommodation of leave under the FMLA.

54.     During Plaintiff's application for unemployment benefits subsequent to his termination, Defendant alleged various instances of misconduct that it claimed to have uncovered during its targeted investigation against Plaintiff after his protected activity.  With the exception of Ms. Miller's accusation that Plaintiff had supposedly granted himself additional security credentials months earlier on June 7, 2018; the fabricated performance issues and complaints that Defendant contends resulted in its decision to terminate Plaintiff were never brought to Plaintiff's attention either prior to or at the time of his termination.

55.     Defendant's stated reasons for terminating Plaintiff are mere pretext for a discriminatory and/or retaliatory termination.

### FIRST CLAIM FOR RELIEF
**(Discrimination in Violation of the Age Discrimination in Employment Act ("ADEA"))**

56.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

57.     At all times relevant to this case, Plaintiff has been at least 40 years of age and therefore protected by the ADEA, 29 U.S.C. §§ 621 – 634.

58.     At all times relevant to this case, Defendant was an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b).

59.     Although Plaintiff at all times successfully performed his job, Defendant discriminated against Plaintiff on the basis of his age by subjecting him to less favorable terms, conditions, and privileges of employment, including, without limitation, placing Plaintiff on mandatory leave and disabling his email access while initiating a targeted investigation of Plaintiff to justify terminating Plaintiff's employment because of his age and replacing Plaintiff with a younger, less qualified employee with less experience as compared to Plaintiff.

60.     Defendant's above-described age-related employment practices and wrongful termination of Plaintiff was intentional and motivated by Plaintiff's age.

61.     Defendant knowingly and willfully engaged in the above-described age-related employment practices and discriminatory termination of Plaintiff on the basis of his age.

62.     As a direct and proximate result of Defendant's above-described age-related employment practices, Plaintiff has suffered damages, including lost wages and benefits; and he is entitled to such general and special damages, economic losses, liquidated damages, punitive damages and attorneys' fees and costs as permitted by law.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of the Age Discrimination in Employment Act ("ADEA"))

63.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

64.     Plaintiff engaged in activity protected by the ADEA pursuant to 29 U.S.C. § 623(d)

when he reported Mr. Vaux's discriminatory comments and conduct targeting his age to Defendant's management and human resources on October 25 and 29, 2018.

65.     Defendant unlawfully retaliated against Plaintiff by placing Plaintiff on mandatory leave and disabling his access to email, initiating a targeted investigation of Plaintiff to try to fabricate purported misconduct, and terminating his employment on November 13, 2018 because of Plaintiff's statutorily protected opposition to discrimination.

66.     A causal connection exists between Plaintiff's protected activities and the Defendant's unlawful materially adverse employment actions.

67.     Defendant acted knowingly and willfully in engaging in the above-described age-related employment practices and retaliatory termination of Plaintiff, in that Defendant knew or showed reckless disregard that its conduct was prohibited by the ADEA.

68.     As a direct and proximate result of Defendant's above-described age-related employment practices, Plaintiff has suffered damages, including lost wages and benefits; and he is entitled to such general and special damages, economic losses, liquidated damages, punitive damages and attorneys' fees and costs as permitted by law.

### THIRD CLAIM FOR RELIEF
**(Actual and/or Perceived Disability Discrimination in Violation of the Americans with Disabilities Act ("ADA"), as amended)**

69.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

70.     Plaintiff is a disabled person within the meaning of the ADA, in that Plaintiff suffered from an actual disability at the time of his termination and/or Defendant regarded Plaintiff as being disabled at the time of his termination due to Plaintiff's known medical condition.

71.     Specifically, Plaintiff suffers from a long-standing medical condition exacerbated by extreme stress that causes Plaintiff to experience severe dizzy spells and vertigo, nausea, vomiting and diarrhea.  When Plaintiff's medical condition is in its active state, and without taking into account ameliorative devices, Plaintiff's medical condition substantially limits one or more of Plaintiff's major life activities, including without limitation, Plaintiff's ability to stand, walk, lift, bend, perform manual tasks, and work as compared to most people in the general population.

72.     At all relevant times, including prior to Plaintiff's termination, Defendant was aware of Plaintiff's medical condition and Plaintiff's record of having such physical impairments.

73.     Plaintiff was able to perform the essential functions of his job duties with Defendant with or without reasonable accommodation.

74.     Defendant unlawfully and intentionally discriminated against Plaintiff because of his actual and/or perceived disabilities by treating Plaintiff less favorably than similarly situated employees concerning the terms, conditions and privileges of his employment, including, without limitation, placing Plaintiff on mandatory leave and disabling his access to email, initiating a targeted investigation of Plaintiff to fabricate purported misconduct, and terminating Plaintiff's employment.

75.     Plaintiff's disability and/or Defendant's perception that Plaintiff was disabled was the motivating factor in Defendant's decisions to subject Plaintiff to the above-described disparate treatment and terminate Plaintiff's employment.

76.     The effect of the practices complained of in the paragraphs above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of Plaintiff's actual and/or perceived disability.

77.     Defendant's above-described conduct was intentional.

78.     Defendant's above-described conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of Plaintiff, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter it and other companies from engaging in the same conduct in the future.

79.     As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

## FOURTH CLAIM FOR RELIEF
### (Interference and Retaliation in Violation of the ADA, as amended)

80.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

81.     Plaintiff is a member of a protected class because of his actual disability and/or because he was regarded as being disabled, and because he had a reasonable, good faith belief that he was engaging in protected activity by attempting to exercise his rights under the ADA and requesting a reasonable accommodation associated with his medical condition.

82.     On October 29, 2018, Plaintiff made a request for a reasonable accommodation related to his actual and/or perceived disabilities.  In doing so, Plaintiff was attempting to exercise his rights and engaging in activity protected under the ADA.

83.     Defendant interfered with Plaintiff's attempt to exercise his right to reasonable accommodation under the ADA and retaliated against Plaintiff because he engaged in the above-described protected activity by treating Plaintiff less favorably than similarly situated employees

concerning the terms, conditions and privileges of his employment, including, without limitation, placing Plaintiff on mandatory paid leave and disabling his access to email while initiating a targeted investigation of Plaintiff to fabricate purported misconduct, and terminating Plaintiff's employment.

84.    A causal connection exists between Plaintiff's protected activities and Defendant's materially adverse actions, i.e., Defendant interfered with Plaintiff's rights under the ADA and placed Plaintiff on mandatory leave, initiated a targeted investigation of Plaintiff to fabricate purported misconduct and discharged Plaintiff because he requested a reasonable accommodation related to his actual and/or perceived disabilities.

85.    Defendant's above-described conduct was intentional.

86.    Defendant's above-described conduct was willful, wanton and malicious, and showed complete indifference to or conscious disregard for the rights of Plaintiff, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter it and other companies from engaging in such conduct in the future.

87.    As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages and attorneys' fees and costs as permitted by law.

## FIFTH CLAIM FOR RELIEF
### (Interference in Violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*)

88.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

89.     The FMLA's purpose is to address the problem of "inadequate job security for employees who have serious life conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(b)(1).

90.     Defendant operates in interstate commerce and has over 50 employees within a 75-mile radius of the location where Plaintiff was employed.  Defendant is therefore a "covered employer," as defined at 29 U.S.C. § 2611(4) under the FMLA.

91.     As a "covered employer" under the FMLA, Defendant is required to offer any "eligible employee," as defined at 29 U.S.C. § 2611(2), up to 12 weeks of leave from work "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

92.     Plaintiff was an "eligible employee" entitled to the protections of the FMLA when his need for leave arose.

93.     Plaintiff was qualified to obtain leave under the FMLA in that he had a serious health condition.

94.     By placing Plaintiff on mandatory leave and disabling his access to email, and terminating Plaintiff, Defendant violated 29 U.S.C. § 2615(a)(1) by unlawfully interfering with, denying, or restraining Plaintiff's right to protected, voluntary medical leave under the FMLA.

95.     Defendant's termination of Plaintiff was related to Plaintiff's attempted exercise of his right to take voluntary medical leave under the FMLA.

96.     Defendant's violations of the FMLA were willful and without justification.

97.     Defendant's above-described conduct and violations of the FMLA were done with malice and oppression and with a conscious disregard for Plaintiff's rights under the FMLA.

98.     Plaintiff is entitled to damages equal to his lost wages, salary, employment benefits and other compensation denied or lost, liquidated damages as provided under the FMLA, costs, attorneys' fees, interest, and equitable relief as deemed appropriate.

### SIXTH CLAIM FOR RELIEF
**(Retaliation in Violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*)**

99.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

100.     Plaintiff engaged in a protected activity by attempting to exercise his right to take leave under the FMLA.

101.     Defendant took actions that a reasonable employee would have found materially adverse when, on the same day that Plaintiff attempted to exercise his rights under the FMLA, Defendant placed Plaintiff on mandatory leave, disabled his email access, and initiated an investigation targeting Plaintiff to fabricate purported misconduct.  Approximately two weeks later, Defendant further retaliated against Plaintiff because he attempted to exercise rights protected under the FMLA by terminating Plaintiff's employment.

102.     Defendant's violations of the FMLA were willful and without justification.

103.     Defendant's above-described conduct and violations of the FMLA were done with malice and oppression and with a conscious disregard for Plaintiff's rights under the FMLA.

104.     Plaintiff is entitled to damages equal to his lost wages, salary, employment benefits and other compensation denied or lost, liquidated damages as provided under the FMLA, costs, attorneys' fees, interest, and equitable relief as deemed appropriate.

### SEVENTH CLAIM FOR RELIEF
**(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et***

*seq.*)

105.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

106.    Plaintiff engaged in protected opposition to discrimination when he made a reasonable report of race discrimination to Defendant's Chief Operating Officer, Matthew Hutchings, on October 25, 2018.

107.    On October 29, 2018, Defendant retaliated against Plaintiff by placing Plaintiff on mandatory paid leave and disabling his email access while Defendant performed a targeted investigation of Plaintiff to fabricate performance issues to attempt to justify his retaliatory termination on November 13, 2018.

108.    A causal connection exists between Plaintiff's protected activity and Defendant's unlawful retaliation.

109.    In unlawfully discriminating and retaliating against Plaintiff, Defendant acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiff's equal rights under the law, thereby necessitating the imposition of punitive damages.

110.    As a result of Defendant's retaliatory conduct, Plaintiff has suffered lost income, emotional pain and suffering, embarrassment, inconvenience, and he is entitled to such general and special damages, and economic damages including front and back pay.  Plaintiff is also entitled to and seeks his attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

### EIGHTH CLAIM FOR RELIEF
**(Retaliation in Violation of 42 U.S.C. § 1981)**

111.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

112.    Plaintiff engaged in activity protected by Section 1981 when he reported race discrimination to Defendant's Chief Operating Officer, Matthew Hutchings, on October 25, 2018.

113.    On October 29, 2018, Defendant retaliated against Plaintiff by placing Plaintiff on mandatory paid leave and disabling his email access while Defendant performed a targeted investigation of Plaintiff to fabricate performance issues to attempt to justify his retaliatory termination on November 13, 2018.

114.    A casual connection exists between Plaintiff's protected activity and Defendant's unlawful retaliation.

115.    In unlawfully retaliating against Plaintiff, Defendant acted intentionally or in the face of a perceived risk that its decisions would violate federal law, thereby necessitating the imposition of punitive damages.

116.    As a result of Defendant's retaliatory conduct, Plaintiff has suffered lost income, emotional pain and suffering, embarrassment, and inconvenience, and he is entitled to general and special damages, and economic damages including front and back pay.  Plaintiff is also entitled to and seeks his attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendant and order the following relief as allowed by law:

A.    Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

B.      All legal and equitable relief available under the ADEA, including liquidated damages;

C.      All legal and equitable relief available for Defendant's violations of the FMLA, including liquidated damages;

D.      Punitive damages for all claims as allowed by law;

E.      Attorneys' fees and costs of this action;

F.      Pre-judgment and post-judgment interest at the highest lawful rate; and

G.      Such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury.

Respectfully submitted this 13th day of December, 2019.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: _s/ Shelby Woods_____
        Claire E. Hunter
        Shelby Woods
        HKM Employment Attorneys LLP
        730 17th Street, Suite 750
        Denver, Colorado 80202
        chunter@hkm.com
        swoods@hkm.com
        *Attorneys for Plaintiff Benjamin Krieger*